UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE: ) | |
| ) | |
| BOSTON EAST TYNGSBORO ) | CHAPTER 11 |
| HOLDINGS LLC ) | |
| ) | CASE NO. 19-41901 |
| DEBTOR ) | |

**EXPEDITED MOTION OF THE LOWELL FIVE CENT SAVINGS BANK
FOR ADEQUATE PROTECTION AND
TO PROHIBIT THE USE OF CASH COLLATERAL**

The Lowell Five Cent Savings Bank (the "Bank"), pursuant to Sections 361 and 363 of the U.S. Bankruptcy Code and Federal Rule of Bankruptcy Procedure ("Bankruptcy Rules") 4001, files this motion ("Motion") seeking an Order: (1) for adequate protection and (2) prohibiting the use of cash collateral by the above-captioned debtor ("Debtor"), and in support thereof, respectfully states:

### I.    Jurisdiction And Venue

1.    This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

### II.    Background

2.    In the summer of 2014, the Debtor approached the Bank about obtaining a commercial loan in connection with its desired acquisition of a hotel commonly known as Stonehedge Hotel & Spa located at 160 & 170 Pawtucket Boulevard in Tyngsboro, Massachusetts (the "Property").

-1-

3. Thereafter, on August 1, 2014, the Bank agreed to extend certain financing ("the "Loan") to the Debtor pursuant to various commercial loan documents (the "Loan Documents") including without limitation the Commitment Letter ("Commitment Letter"), Business Loan Agreement (the "Loan Agreement"), Commercial Promissory Note (the "Note"), Commercial Construction Real Estate Mortgage ("Mortgage"), Commercial Security Agreement ("Security Agreement") and Assignment of Leases and Rents ("Assignment").

4. Under the Loan Documents, the Bank agreed to extend financing to the Debtor in an amount "[u]p to $3,850,000," limited by a 65% loan-to-value ratio of the appraised value of the collateral. A 65% loan-to-value ratio is the maximum allowed by Lowell Five for all of its non-recourse loans.

5. Prior to August 1, 2014, the Bank received an appraisal of the Property— a pre-closing condition under the Loan—valuing the Property at $5,100,000.

6. On August 1, 2014, in accordance with the Loan, the Bank provided the Debtor with $3,200,000 of acquisition financing at closing on or about August 1, 2014, which enabled the Debtor to acquire the Property.

7. In the months following this closing, the Bank advanced an additional $115,000 to the Debtor under the Loan for a total amount of $3,315,000, which equaled the maximum amount permitted under the 65% loan-to-value ratio limitation specified in the Loan, based on the then-appraised value of the Property of $5,100,000.

8. In May 2015, the Debtor's principal, Abhijit Das ("Mr. Das"), approached the Bank about a dispute he was having with Debtor's 47% investor, Steve Elbaum. Mr. Elbaum asserted that Mr. Das had misled him about the amount of funding that was to be raised by Debtor, and asserted that the hotel was being mismanaged. In response, Mr. Das had come to

agreement with Mr. Elbaum that would entail a buyout of Mr. Elbaum's stock interest in exchange for $800,000. Mr. Das, however, had not been able to raise sufficient capital to fund this buyout, and sought an additional $300,000 from the Bank. In support of this request, Mr. Das told the Bank that he was confident he could raise the $300,000, but that the timing of the payout would be problematic.

9. If the Bank advanced the requested funds, however, this would exceed the 65% loan-to-value ratio limit. As a result, in an effort to assist Mr. Das with his investor problem, the parties discussed an amendment to the Loan, and approval for a loan modification was sought from the Bank's Executive Committee.

10. On June 4, 2015, with approval from the Bank's Executive Committee, the Bank and Debtor executed a Change in Terms Agreement (the "Change Agreement"), in which the Bank agreed to advance an additional $300,000 to the Debtor, in addition to the $3,315,000 then-outstanding, subject to the Debtor raising an additional $300,000 in capital within 60 days of the Change Agreement. In exchange, Mr. Das and his parents—Mukti Das, and Mitra Das provided the Bank with an unlimited personal guarantee of all obligations of the Debtor to the Bank.

11. That same day, the Bank provided the Debtor with the $300,000 specified in the Change Agreement. The Debtor, however, failed to raise the $300,000 in capital within 60 days as required under the Change Agreement.

12. In addition to the Debtor's failure to comply with the terms of the Change Agreement, throughout the life of the Loan the Debtor consistently failed to timely comply with its payment and financial disclosure obligations. Over the course of the Loan, the Debtor has been late with its payments at least 35 times, and beginning in May 2018, has been late every single month, stopping payment altogether in early-to-mid 2019.

13. Based on the limited financial disclosures produced to the Bank, which were also late and incomplete, the Bank was made aware that the Debtor was posting significant financial losses on the hotel.

14. The Bank was also aware that the Debtor had encountered a number of obstacles in its operations, including a decrease in revenue in the winter of 2015 due to significant snowfall, a shutdown in operations for much of 2016 due to a main sprinkler pipe burst, and operational impacts in 2017 due to a roof fire.

15. On March 1, 2016, in an effort to assist the Debtor in its recovery efforts following the burst water pipe, the Bank agreed to a modification to the Loan, suspending for six months the Debtor's obligation to make payments towards the principal of the Loan.

16. Similarly, in an effort to assist the Debtor with its financial difficulties, the Bank agreed to a modification to the Loan, suspending for three months the Debtor's obligation to make payments towards the principal of the Loan.

17. Despite these efforts by the Bank, the Debtor continued to incur significant losses and struggled to satisfy its obligations under the Loan. At some point in 2016 or 2017, in violation of the Loan, the Debtor secured a loan from a third-party at an extremely high rate, secured by all of Debtor's property.

18. Despite these financial issues, the Bank learned that Mr. Das was at the same time expanding his business portfolio by buying, in 2017, a 108-foot yacht to be used as a hotel, and in May 2019, a resort in Philadelphia. Also, despite Mr. Das' representations that he was raising additional capital to fund these purchases, the Debtor continued to fail to meet its payment obligations under the Loan.

19. In 2019, the Debtor also appears to have shifted some or all of its operations, previously run by the Debtor, to a separate operating company called Troca Tyngsboro Hotel LLC, formed by Mr. Das in February 2019, or to Troca Hotels Management LLC, also formed by Mr. Das. It is not clear whether this shift entailed an improper transfer of assets from the Debtor to the new operating company, or what the arrangement is between the Debtor and the operating company, including whether any lease payments or profits are being provided to the Debtor.

20. On May 20, 2019, the Bank sent the Debtor a final demand notification (the "Final Demand Notification") that the Loan was in default due to the Debtor being two months behind on payments (April and May 2019), with a total arrearage as of that time of $54,921.28. As a result of these defaults under the Loan, the Bank demanded that the Debtor cure these defaults by June 20, 2019.

21. Following the issuance of the Final Demand Notification, the Debtor largely abandoned its efforts to continue to make payments under the Loan.

22. On July 1, 2019, due to Debtor's failure to bring the loan indebtedness current, and as permitted by the Loan, the Bank sent Debtor a Notice of Acceleration of the Loan (the "Acceleration Notice"), demanding full payment of the Loan and all amounts then due under the Loan Documents, together with notice that failure to make this accelerated payment within thirty days could result in election by the Bank to initiate foreclosure proceedings.

23. On August 21, 2019, the Debtor deposited into one of its bank accounts located at the Bank a $500,000 check from its insurer. Based on this deposit, the Bank became aware that the Debtor had made a claim with its insurer for damage to the property. This was concerning to the Bank since it was unaware of any particular damage to the Property at that time and, as

mortagee and loss payee for the Property, should have been included as a joint payee on that insurance payment, as it had been for previous payments by the Debtor's insurers.

24. On September 28, 2019, representatives of the Bank met with Mr. Das. At this meeting, Mr. Das acknowledged that the hotel had suffered significant damage due to a microburst (i.e. severe wind), and that its insurer had advanced any emergency payment of $500,000 for repairs. Further, the Debtor represented that its revenue was down 40% for 2019, and that it did not anticipate an increase in future revenue because its bookings through the year were down and because it had only made enough repairs to make the hotel "habitable," but not enough to make it "aesthetically pleasing."

25. To date, despite the Debtor's receipt of $500,000 from its insurer to make repairs to the Property from the microburst damage, these repairs have not been completed. Rather, the Bank's records reflect that the Debtor has misused those funds by transferring them to Mr. Das' parents, to Mr. Das' other businesses, and to pay off certain tax liens on the Property.

26. As a result of the Debtor's failure to pay all amounts due under the Loan, and due to the Bank's increasing concerns relating to the Debtor's failure to maintain the Property and its possible misuse of insurance proceeds, the Bank initiated a foreclosure of the Mortgage and scheduled a foreclosure sale of the Property for December 5, 2019 (the "Foreclosure"). As part of the Foreclosure, the Bank retained foreclosure counsel, engaged an auctioneer, and incurred necessary costs for advertising the Foreclosure sale.

27. On the eve of the Foreclosure sale, and in order to halt that sale, the Debtor filed this Chapter 11 bankruptcy petition. The Debtor has indicated in its petition that it is a "single asset real estate" debtor within the meaning of that term in the Bankruptcy Court. At the same

time, the accompanying schedules of assets and liabilities indicate the existence of substantial unsecured debts associated with operating expenses for the hotel.

28. As of the Petition Date, the Debtor owed a sum of not less than $3,518,662.45 to the Bank on the Note, together with continuing interest, collection costs and attorney's fees. The Bank will prepare and file a proof of claim to detail all obligations owed.

29. On November 25, 2019, the Bank received an appraisal performed for the Foreclosure sale, reflecting that the value of the Property has dropped from $5,100,000 in 2014 to an amount significantly below the amount of the secured debt, leaving the Bank undersecured.

### III. The Court Should Require Adequate Protection and Prohibit the Use of Cash Collateral

30. The Debtor has not filed a motion for authorization to use cash collateral nor a motion seeking approval of any proposed post-petition financing. The Debtor has not proposed any adequate protection to the Bank nor provided any disclosure about its projected income and expenses.

31. The Debtor filed schedules of assets and liabilities ("Schedules") together with its petition but has not as of yet filed its required schedule of financial affairs ("SOFA"), which is not due until December 19, 2019. No typical motions providing any background about the Debtor's financial situation or current operations have been filed.

32. In response to question 7 of the petition, the Debtor describes its business as "single asset real estate" within the meaning of Section 101(51B) of the Bankruptcy Code. Of course, the definition provides that "single asset real estate" means "real property constituting a single property or project … which generates substantially all of the gross income of a debtor… and on which no substantial business is being conducted by a debtor other than the business of operating the real property and activities incidental thereto."

33. In this case, the Debtor is the fee owner of the Real Property. The Schedules, however, indicate that the Debtor has incurred substantial liability in connection with the operation of a hotel, restaurant and spa located on the Real Property. Further, upon information and belief, until early 2019, the Debtor served as the operating company for the businesses on the Real Property.

34. The obligations of the Debtor to the Bank are secured by a properly perfected first priority mortgage on the Real Property and a properly perfected firs priority security interest in the Personal Property. Upon information and belief, hospitality operations on the Real Property continue generating cash in which the Bank has a security interest. And presumably cash is necessary to fund operating expense and will clearly be needed as well to maintain any existence in chapter 11 to cover expenses such as US Trustee quarterly fees. Yet, the sources and uses of cash available to the Debtor, which are typically detailed out in a motion for approval of usage of cash collateral, are known only to the Debtor at this point.

35. Additionally, the Debtor has received insurance payments relating to damage to the property in 2019, and may receive further funds from the insurer relating to that damage. Based on the Bank's records, it appears that the Debtor has already misused some or all of these insurance proceeds.

36. Further exacerbating the situation, the Debtor's principal reportedly left the country shortly after filing the petition thus delaying the customary initial case conference with the US Trustee which the Bank understands is now scheduled for December 19, 2019.

37. The Debtor commenced its case to obtain the benefit of the automatic stay and prevent the immediate consummation of a foreclosure sale that was scheduled to occur on December 5, 2019. Having obtained a major benefit of chapter 11, the Debtor also has the

obligation to meet the associated burdens—including the obligation to provide adequate protection to secured creditors and the obligation to obtain court approval or permission to use cash collateral.

38. Of course, a debtor's ability to use cash collateral is governed by 11 U.S.C. § 363(c)(2), which provides that "the [debtor] may not use, sell, or lease cash collateral under paragraph (1) of this subsection unless: (A) each entity that has an interest in such cash collateral consents; or (B) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section."

39. The Debtor has not requested, and the Bank has not consented to, and the Court has not authorized, the Debtor's use of cash collateral. Accordingly, the Debtor must be prohibited from using cash collateral and should be required to provide to the Court and parties in interest an accounting of cash usage since the Petition Date.

40. It is unclear what expenses are currently being paid by the Debtor or which funds are being used. But all cash in possession of the Debtor is the Bank's cash collateral by virtue of the Loan documents described above.

41. The Debtor has the burden of proof to show that it has provided adequate protection to the Bank. *See* 11 U.S.C. § 363(p). The Debtor has not proposed to make any payments to the Bank or otherwise provide any adequate protection.

**WHEREFORE**, the Bank respectfully requests that this Court enter an expedited Order: (1) granting the instant Motion; (2) granting the Bank adequate protection; (3) prohibiting the Debtor's use of cash collateral; and (4) granting such other relief that this Court deems just and proper.

|  |  |
|---|---|
|  | Respectfully submitted, |
|  | THE LOWELL FIVE CENT SAVINGS BANK |
|  | By its attorneys, |
|  | */s/ John G. Loughnane* |
|  | Stephen J. Brake (BBO# 546972) |
|  | sbrake@nutter.com |
|  | John G. Loughnane (BBO# 557599) |
|  | jloughnane@nutter.com |
|  | Brian K. Lee (BBO# 676268) |
|  | blee@nutter.com |
|  | Nutter McClennen & Fish LLP |
|  | Seaport West |
|  | 155 Seaport Boulevard |
|  | Boston, MA 02210-2604 |
| Dated: December 17, 2019 | (617) 439-2000 |

**Local Rule 9013-1(g)(C) Certification**

    I, John G. Loughnane, with the law firm Nutter, McClennen & Fish LLP hereby certify that I have a made a reasonable, good faith effort to advise all affected parties of the substance of this motion and the request for an expedited determination by speaking, on December 17, 2019, by phone with counsel for the Debtor, Jesse I Redlener, and with the U.S. Trustee, Richard King, and informing them of the substance of this motion.

                                            */s/ John G. Loughnane*
                                            John G. Loughnane

## CERTIFICATE OF SERVICE

      I, John G. Loughnane, hereby certify that on December 17, 2019, this document, filed through the CM/ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF), with paper copies sent by U.S First Class Mail to the 20 secured creditors as follows:

Atlantic Charter Insurance Group
25 New Chardon Street
Boston, MA  02114

Booking.Com
P.O. Box 414462
Boston, MA  02241-4462

Employers Preferred Insurance Co.
P.O. Box 53089
Phoenix, AZ  85072

Guardian Energy Management Solutions LLC
420 Northboro Road Central
Marlborough, MA  01752

Internal Revenue Service
P.O. Box 21126
Philadelphia, PA  19114

New England Fire & Sprinkler Protection
P.O. Box 212
North Chelmsford, MA  01863

ServiceMaster Elite
14 Willey Road
Saco, ME  04072

Sysco Business Services
24500 Hwy 290
Cypress, TX  77429

Town of Tyngsborough
25 Bryants Lane
Tyngsboro, MA  01879

B&G Restaurant Supply
48 Eagle Street
Pittsfield, MA  01201

CCAPS d/b/a Service Master Elite
12 Continental Blvd.
Merrimack, NH  03054

Gray Wolf Realty LLC
365 Riverbend Drive
Groton, MA  01450

Halley Elevator Co.
11 Tyng Street
Newburyport, MA  01950

Mitra Das
104 Blueberry Hill Lane
North Andover, MA  01845

Preti Flaherty Beliveau & Pachios LLP
P.O. Box 9546
Portland, ME  04112

SERVPRO Extreme
Response Team Olson
697 S. Pierce Ave.
Louisville, CO  80027

The River
814 Elm Street
Manchester, NH  03101

Troca Hotels Management LLC
733 Turnpike Street, Suite 226
North Andover, MA  01845

Zurich North America
P.O. Box 4664
Carol Stream, IL  60197-4664

                                                */s/ John G. Loughnane*
                                                John G. Loughnane

4684760.2